John A. Vogt (State Bar No. 198677)
Edward S. Chang (State Bar No. 241682)
Ann T. Rossum (State Bar No. 2871236)
JONES DAY
3161 Michelson Drive, Suite 800
Irvine, CA 92612
Telephone:   (949) 851.3939
Facsimile:    (949) 553.7539
Email:  javogt@jonesday.com
Email:  echang@jonesday.com
Email:  atrossum@jonesday.com

Michael A. Carvin (*Pro Hac Vice to be filed*)
Anthony J. Dick (*Pro Hac Vice to be filed*)
William D. Coglianese (*Pro Hac Vice to be filed*)
JONES DAY
51 Louisiana Avenue NW
Washington, DC 20001
Telephone:   (202) 879.3939
Facsimile:    (202) 626.1700
Email:  macarvin@jonesday.com
Email:  ajdick@jonesday.com
Email:  wcoglianese@jonesday.com

Michael E. Rosman (*Pro Hac Vice to be filed*)
CENTER FOR INDIVIDUAL RIGHTS
1100 Connecticut Ave. NW, Suite 625
Washington, DC 20036
Telephone:   (202) 833.8400
Facsimile:    (202) 833.8410
Email:  rosman@cir-usa.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

|  |  |
|---|---|
| RYAN YOHN; MICHELLE RALEY; STACY VEHRS; ROBERT VEHRS; DARREN MILLER; BRUCE ASTER; ALLEN OSBORN; GEORGE MEILAHN; ASSOCIATION OF AMERICAN EDUCATORS, <br><br> Plaintiffs, <br><br> v. | Case No. _____ <br><br><br> **COMPLAINT** |

1  CALIFORNIA TEACHERS
   ASSOCIATION; NATIONAL
2  EDUCATION ASSOCIATION;
   WESTMINSTER TEACHERS
3  ASSOCIATION; EUREKA UNION
   TEACHERS ASSOCIATION;
4  PORTERVILLE EDUCATORS
   ASSOCIATION; SAN JUAN
5  TEACHERS ASSOCIATION;
   CARLSBAD UNIFIED TEACHERS
6  ASSOCIATION; RIVERSIDE CITY
   TEACHERS ASSOCIATION;
7  PITTSBURG EDUCATION
   ASSOCIATION; MARIAN KIM
8  PHELPS, in her official capacity as
   Superintendent of Westminster School
9  District; TOM JANIS, in his official
   capacity as Superintendent of Eureka
10 Union School District; KEN GIBBS, in
   his official capacity as Superintendent
11 of Porterville Unified School District;
   KENT KERN, in his official capacity
12 as Superintendent of San Juan Unified
   School District; BENJAMIN
13 CHURCHILL, in his official capacity
   as Superintendent of Carlsbad Unified
14 School District; DAVID HANSEN, in
   his official capacity as Superintendent
15 of Riverside Unified School District;
   JANET SCHULZE, in her official
16 capacity as Superintendent of Pittsburg
   Unified School District; XAVIER
17 BECERRA, in his official capacity as
   Attorney General of California,

18             Defendants.

19

20

21

22

23

24

25

26

27

28

COMPLAINT

1      Plaintiffs Ryan Yohn, Michelle Raley, Stacy Vehrs, Robert Vehrs, Darren

2 Miller, Bruce Aster, Allen Osborn, George Meilahn, and the Association of

3 American Educators, by and through their undersigned counsel, allege as follows:

4                          **INTRODUCTION**

5      1.     The First Amendment to the United States Constitution protects the

6 individual rights of free speech and free association, including the right to withhold

7 support from political causes and activities that conflict with one's beliefs.  "When

8 a State establishes an 'agency shop' that exacts compulsory union fees as a

9 condition of public employment, 'the dissenting employee is forced to support

10 financially an organization with whose principles and demands he may disagree.'

11 Because a public-sector union takes many positions during collective bargaining

12 that have powerful political and civic consequences, the compulsory fees constitute

13 a form of compelled speech and association that imposes a significant impingement

14 on First Amendment rights." *Knox v. SEIU, Local 1000*, 132 S. Ct. 2277, 2289

15 (2012) (citations and alterations omitted).  Indeed, "[a]gency-fee provisions

16 unquestionably impose a heavy burden on the First Amendment interests of

17 objecting employees." *Harris v. Quinn*, 134 S. Ct. 2618, 2643 (2014).

18      2.     The State of California (the "State") and its public school districts, in

19 cooperation with the California Teachers Association ("CTA") and the other named

20 Defendants, maintain an agency-shop regime that injures public-school teachers

21 (including Plaintiffs) by forcing them to make financial contributions to teachers'

22 unions as a condition of public employment.  This agency-shop regime is

23 established and maintained under color of state law:  the California Educational

24 Employment Relations Act.  *See* Cal. Gov't Code § 3540 *et seq*.  Each year, the

25 unions estimate a breakdown of expenditures that will be "chargeable" (i.e.,

26 germane to collective bargaining) and "nonchargeable" (i.e., not germane to

27 collective bargaining).  Teachers are required to contribute to the union's

28 chargeable expenditures.  Teachers who wish to avoid contributing to a union's

noncharfeable expenditures are annually forced to affirmatively express that they do not wish to contribute. Each year they must send the union a new notice indicating their objection. This opt-out process is unnecessarily burdensome.

3. Even if a teacher successfully completes the opt-out process, he or she is still forced to pay the chargeable portion of fees to support the union's collective-bargaining activities. Any teacher who objects to the union's classification of certain expenditures as chargeable must bear the additional burden and expense of filing a legal challenge.

4. California's agency-shop arrangement violates Plaintiffs' First Amendment rights in two distinct ways. First, it violates Plaintiffs' rights of free speech and association by forcing them to contribute to so-called chargeable union expenditures that are germane to collective bargaining, even though those contributions provide economic support to nonchargeable union activities and even though many of the chargeable expenditures and collective-bargaining activities are contrary to Plaintiffs' political beliefs and personal interests. Second, the agency-shop arrangement violates Plaintiffs' rights of free speech and association by forcing them to undergo an opt-out process each year to avoid contributing to political and ideological expenditures that Defendant Unions[1] concede are *not* germane to collective bargaining.

5. These severe infringements on Plaintiffs' rights to free speech and association cannot withstand First Amendment scrutiny. Laws mandating compulsory speech and association must be narrowly tailored to serve a compelling government interest. California's agency-shop arrangement cannot meet that standard. Requiring nonmembers to make forced contributions to public-sector collective-bargaining efforts serves no compelling state interest and is not narrowly tailored. Similarly, requiring nonmembers to contribute to nonchargeable union

---

[1] In this Complaint, "Defendant Unions" encompasses CTA, the National Education Association ("NEA"), and the seven Defendant Local Unions.

COMPLAINT

expenditures, unless they annually opt out of doing so, also serves no compelling state interest and is not narrowly tailored.  Also, neither the agency shop nor the opt-out requirement can satisfy even the lower standard that applies to employee speech on matters of public concern, under which courts balance the employee's interests in speaking against the government's interests, as an employer, in suppressing the speech.

6.     It is clear that the State's agency shop does not serve the interests of all public-school teachers.  In the course of collective bargaining, unions frequently take politically controversial positions on matters of public concern that contradict the deeply held beliefs of some teachers, who do not believe the policies advocated by unions to be in their best interest or in the best interest of society at large.  For example, unions consistently "bargain" for provisions requiring increased state spending and against important educational reforms which some teachers believe would benefit teachers, students, and taxpayers.  Even in purely material terms, seniority provisions and other union-advocated employment protections benefit some teachers at the expense of other teachers who would fare better under an alternative system.

7.     Recognizing that compulsory agency fees violate the First Amendment will not undermine Defendant Unions' authority or entitlement to engage in collective bargaining.  The Defendant Local Unions will remain the exclusive collective-bargaining agent in each school district as long as they retain the support of a majority of teachers in those districts.  Public-school teachers will, therefore, remain fully entitled to join together and collectively bargain through Defendant Unions for any and all desired labor protections.

8.     Given the severe and ongoing infringement of Plaintiffs' rights to free speech and free association, Plaintiffs respectfully request that this Court declare that California's practice of forcing nonunion members to contribute funds to unions—including funds to support their collective-bargaining activities—violates

the First Amendment, and enjoin Defendants from enforcing this unconstitutional arrangement.

9.     Plaintiffs additionally request that this Court declare that Defendants' practice of requiring an annual affirmative opt-out to avoid contributing to nonchargeable union expenditures violates the First Amendment, and enjoin Defendants from imposing this unconstitutional burden.

## PARTIES

10.     Plaintiff Ryan Yohn has been a public-school teacher in the Westminster School District for 13 years.  He resigned his union membership in 2012.  Nevertheless, the collective-bargaining agreement in his district requires Mr. Yohn to pay agency fees to the union that is recognized as the exclusive representative, Defendant Westminster Teachers Association.  CBA Between Westminster Sch. Dist. & Westminster Teachers Association, at Art. III, § 4.2 (attached as Exhibit A).  Since resigning his union membership, Mr. Yohn has opted out of paying the nonchargeable portion of the agency fees.  But for California's agency-shop arrangement, Mr. Yohn would not pay fees to or otherwise subsidize the teachers' union, and he objects to the State's forced subsidization policy.  Mr. Yohn objects to the agency shop, the opt-out requirement, and many of the unions' public-policy positions, including positions taken in collective bargaining.  If it were not for Westminster School District's agency-shop arrangement with the Westminster Teachers Association, and if it were not for California's law authorizing and implementing these arrangements, Mr. Yohn would not pay any fees to or otherwise subsidize the Westminster Teachers Association, CTA, or NEA.

11.     Plaintiff Michelle Raley has been a public-school teacher in the Eureka Union School District for 17 years.  She resigned her union membership in 2015. Nevertheless, the collective-bargaining agreement in her district requires Ms. Raley to pay agency fees to the union that is recognized as the exclusive representative,

1   Defendant Eureka Union Teachers Association.  CBA Between Eureka Union
2   Elementary School District & Eureka Union Teachers Association, at § 9.1
3   (attached as Exhibit B).  Since resigning her union membership, Ms. Raley has
4   opted out of paying the nonchargeable portion of the agency fees.  But for
5   California's agency-shop arrangement, Ms. Raley would not pay fees to or
6   otherwise subsidize the teachers' union, and she objects to the State's forced
7   subsidization policy.  Ms. Raley objects to the agency shop, the opt-out
8   requirement, and many of the unions' public-policy positions, including positions
9   taken in collective bargaining.  If it were not for Eureka Union School District's
10  agency-shop arrangement with the Eureka Union Teachers Association, and if it
11  were not for California's law authorizing and implementing these arrangements,
12  Ms. Raley would not pay any fees to or otherwise subsidize the Eureka Union
13  Teachers Association, CTA, or NEA.

14        12.     Plaintiff Stacy Vehrs has been a public-school teacher in the
15  Porterville Unified School District for 24 years.  Ms. Vehrs has never been a
16  member of the union that is recognized as the exclusive representative in her
17  district, Defendant Porterville Educators Association.  Nevertheless, the collective-
18  bargaining agreement in her district requires Ms. Vehrs to pay agency fees to
19  Defendant Porterville Educators Association.  CBA Between Porterville Unified
20  Sch. Dist. & Porterville Educators Ass'n, at Art. XXXII (attached as Exhibit C).
21  Ms. Vehrs has opted out of paying the nonchargeable portion of the agency fees.
22  But for California's agency-shop arrangement, Ms. Vehrs would not pay fees to or
23  otherwise subsidize the teachers' union, and she objects to the State's forced
24  subsidization policy.  Ms. Vehrs objects to the agency shop, the opt-out
25  requirement, and many of the unions' public-policy positions, including positions
26  taken in collective bargaining.  If it were not for Porterville Unified School
27  District's agency-shop arrangement with the Porterville Educators Association, and
28  if it were not for California's law authorizing and implementing these

COMPLAINT

1   arrangements, Ms. Vehrs would not pay any fees to or otherwise subsidize the

2   Porterville Educators Association, CTA, or NEA.

3        13.     Plaintiff Robert Vehrs has been a public-school teacher in the

4   Porterville Unified School District for 27 years.  Mr. Vehrs has never been a

5   member of the union that is recognized as the exclusive representative in his

6   district, Defendant Porterville Educators Association.  Nevertheless, the collective-

7   bargaining agreement in his district requires Mr. Vehrs to pay agency fees to

8   Defendant Porterville Educators Association.  Ex. C at Art. XXXII.  Mr. Vehrs has

9   opted out of paying the nonchargeable portion of the agency fees.  But for

10  California's agency-shop arrangement, Mr. Vehrs would not pay fees to or

11  otherwise subsidize the teachers' union, and he objects to the State's forced

12  subsidization policy.  Mr. Vehrs objects to the agency shop, the opt-out

13  requirement, and many of the unions' public-policy positions, including positions

14  taken in collective bargaining.  If it were not for Porterville Unified School

15  District's agency-shop arrangement with the Porterville Educators Association, and

16  if it were not for California's law authorizing and implementing these

17  arrangements, Mr. Vehrs would not pay any fees to or otherwise subsidize the

18  Porterville Educators Association, CTA, or NEA.

19       14.     Plaintiff Darren Miller has been a public-school teacher in the San

20  Juan Unified School District for 16 years.  He resigned his union membership in

21  2005.  Nevertheless, the collective-bargaining agreement in his district requires Mr.

22  Miller to pay agency fees to the union that is recognized as the exclusive

23  representative, Defendant San Juan Teachers Association.  CBA Between San Juan

24  Unified Sch. Dist. & San Juan Teachers Ass'n, at § 12.05.1 (attached as Exhibit D).

25  Since resigning his union membership, Mr. Miller has opted out of paying the

26  nonchargeable portion of the agency fees.  But for California's agency-shop

27  arrangement, Mr. Miller would not pay fees to or otherwise subsidize the teachers'

28  union, and he objects to the State's forced subsidization policy.  Mr. Miller objects

to the agency shop, the opt-out requirement, and many of the unions' public-policy positions, including positions taken in collective bargaining.  If it were not for San Juan Unified School District's agency-shop arrangement with the San Juan Teachers Association, and if it were not for California's law authorizing and implementing these arrangements, Mr. Miller would not pay any fees to or otherwise subsidize the San Juan Teachers Association, CTA, or NEA.

15.   Plaintiff Bruce Aster has been a public-school teacher in the Carlsbad Unified School District for 29 years.  Mr. Aster has never been a member of the union that is recognized as the exclusive representative in his district, Defendant Carlsbad Unified Teachers Association.  Nevertheless, the collective-bargaining agreement in his district requires Mr. Aster to pay agency fees to Defendant Carlsbad Unified Teachers Association.  CBA Between Carlsbad Unified Sch. Dist. & Carlsbad Unified Teachers Ass'n, at § 21.1 (attached as Exhibit E).  Mr. Aster has opted out of paying the nonchargeable portion of the agency fees.  But for California's agency-shop arrangement, Mr. Aster would not pay fees to or otherwise subsidize the teachers' union, and he objects to the State's forced subsidization policy.  Mr. Aster objects to the agency shop, the opt-out requirement, and many of the unions' public-policy positions, including positions taken in collective bargaining.  If it were not for Carlsbad Unified School District's agency-shop arrangement with the Carlsbad Unified Teachers Association, and if it were not for California's law authorizing and implementing these arrangements, Mr. Aster would not pay any fees to or otherwise subsidize the Carlsbad Unified Teachers Association, CTA, or NEA.

16.   Plaintiff Allen Osborn has been a public-school teacher in the Riverside Unified School District for 11 years.  Mr. Osborn has never been a member of the union that is recognized as the exclusive representative in his district, Defendant Riverside City Teachers Association.  Nevertheless, the collective-bargaining agreement in his district requires Mr. Osborn to pay agency

fees to Defendant Riverside City Teachers Association.  CBA Between Riverside

Unified Sch. Dist. & Riverside City Teachers Ass'n, at Art. VI, § 2 (attached as

Exhibit F).  Mr. Osborn has opted out of paying the nonchargeable portion of the

agency fees.  But for California's agency-shop arrangement, Mr. Osborn would not

pay fees to or otherwise subsidize the teachers' union, and he objects to the State's

forced subsidization policy.  Mr. Osborn objects to the agency shop, the opt-out

requirement, and many of the unions' public-policy positions, including positions

taken in collective bargaining.  If it were not for Riverside Unified School District's

agency-shop arrangement with the Riverside City Teachers Association, and if it

were not for California's law authorizing and implementing these arrangements,

Mr. Osborn would not pay any fees to or otherwise subsidize the Riverside City

Teachers Association, CTA, or NEA.

      17.    Plaintiff George Meilahn has been a public-school teacher in the

Pittsburg Unified School District for 19 years.  He resigned his union membership

in 2006.  Because of his religious principles, Mr. Meilahn is a religious objector

under California Government Code section 3546.3, which provides that "any

employee who is a member of a religious body whose traditional tenets or teachings

include objections to joining or financially supporting employee organizations shall

not be required to join, maintain membership in, or financially support any

employee organization as a condition of employment."  Under section 3546.3, a

religious objector can be required, as a condition of employment, to pay a sum

equal to the agency fee (including the non-chargeable portion) "to a nonreligious,

nonlabor organization, charitable fund" that the employee chooses from a list of at

least three such charitable funds.  The charitable funds included on this list are

chosen by the union that is recognized as the exclusive representative for that

district.  In accordance with State law and the collective-bargaining agreement

entered into by the union representing his district (Defendant Pittsburg Education

Association), each year Mr. Meilahn is required to donate the full amount of the

1   agency fee—not merely the chargeable portion—to one of four State-approved

2   charities specified in the collective-bargaining agreement.  CBA Between Pittsburg

3   Unified Sch. Dist. & Pittsburg Education Ass'n, at § 5.3 (attached as Exhibit G).

4   Despite having made known his objection to paying any amount to a union, Mr.

5   Meilahn recently learned that his district is automatically deducting $1 from each of

6   his paychecks and giving that amount to Defendant Pittsburg Education

7   Association.  Email from R. Cuyugan to G. Meilahn (Jan. 26, 2017) (attached as

8   Exhibit H).  Mr. Meilahn was never informed of this change, and objects to this

9   redirection of his earnings to a union.  Mr. Meilahn objects to the agency shop, the

10  opt-out requirement, and many of the unions' public-policy positions, including

11  positions taken in collective bargaining.  But for California's agency-shop

12  arrangement, Mr. Meilahn would not pay fees to or otherwise subsidize the

13  teachers' union, would decide for himself how much to donate in charitable

14  contributions every year, and would not have his charitable contributions

15  constrained by a collective-bargaining agreement.

16       18.    Plaintiff Association of American Educators ("AAE") is a nonprofit

17  organization representing nonunion professional educators.  Founded and

18  incorporated in California, AAE's membership consists of teachers, administrators,

19  and para-professionals, and many other public- and private-school employees.

20  AAE has approximately 1,400 members in the State of California, most of whom

21  are subject to the unconstitutional arrangements outlined herein.  The individual

22  Plaintiffs here are AAE members.  AAE and its members object to California's

23  laws authorizing agency-shop arrangements and opt-out requirements, and also

24  object on policy grounds to the positions taken by teachers' unions in the

25  collective-bargaining process and outside of that process.  The interests that AAE

26  seeks to protect in this lawsuit are germane to the organization's purpose, and

27  neither the claims asserted nor the relief requested require the participation in this

28  lawsuit of AAE's individual members.  In addition, Defendants' conduct pursuant

1   to the State's agency-shop laws has the effect of creating a drain on AAE's

2   resources.  There is a direct conflict between AAE's mission and the challenged

3   agency-shop arrangements, and AAE engages in counseling, referral, advocacy, and

4   educational services relating to California's agency-shop arrangements,

5   independently of this litigation.

6         19.    Defendant California Teachers Association ("CTA") is the California

7   affiliate of Defendant National Education Association.  It is the largest teachers'

8   union in California and one of the largest public-employee unions in the United

9   States.  It receives a share of the agency fees that are extracted from Plaintiffs and

10  other public-school teachers under California's agency-shop laws.  It has annual

11  revenues of over $180 million per year.  CTA is a major participant in California

12  politics and is heavily active at all levels of state and local government.

13        20.    Defendant National Education Association ("NEA") is the largest

14  teachers' union in the United States and one of the largest public-sector unions.  It

15  receives a share of the agency fees that are extracted from Plaintiffs and other

16  public-school teachers under California's agency-shop laws.  It has annual revenues

17  of over $400 million per year.  NEA, *Financial Reports* at 8 (July 2016),

18  https://goo.gl/bzjLPZ.  NEA is a major participant in political activities at the

19  national, state, and local levels.

20        21.    Defendant Westminster Teachers Association is the local union that is

21  recognized as the exclusive bargaining representative in the Westminster School

22  District.  Its state affiliate is CTA and its national affiliate is NEA.

23        22.    Defendant Eureka Union Teachers Association is the local union that

24  is recognized as the exclusive bargaining representative in the Eureka Union School

25  District.  Its state affiliate is CTA and its national affiliate is NEA.

26        23.    Defendant Porterville Educators Association is the local union that is

27  recognized as the exclusive bargaining representative in the Porterville Unified

28  School District.  Its state affiliate is CTA and its national affiliate is NEA.

24.     Defendant San Juan Teachers Association is the local union that is recognized as the exclusive bargaining representative in the San Juan Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

25.     Defendant Carlsbad Unified Teachers Association is the local union that is recognized as the exclusive bargaining representative in the Carlsbad Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

26.     Defendant Riverside City Teachers Association is the local union that is recognized as the exclusive bargaining representative in the Riverside Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

27.     Defendant Pittsburg Education Association is the local union that is recognized as the exclusive bargaining representative in the Pittsburg Unified School District.  Its state affiliate is CTA and its national affiliate is NEA.

28.     Defendant Superintendents are the executive officers in charge of the school districts that employ Plaintiff teachers, pay Plaintiff teachers' wages, and process all deductions therefrom, including for union dues and agency fees pursuant to agency-shop arrangements authorized by state law.  Cal. Gov't Code § 3540 *et seq*.; Cal. Educ. Code § 45061.  Defendant Superintendents are sued in their official capacity.

29.     Defendant Marian Kim Phelps is the superintendent of Westminster School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Ryan Yohn.

30.     Defendant Tom Janis is the superintendent of Eureka Union School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Michelle Raley.

31.     Defendant Ken Gibbs is the superintendent of Porterville Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiffs Stacy Vehrs and Robert Vehrs.

32.     Defendant Kent Kern is the superintendent of San Juan Unified School

COMPLAINT

District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Darren Miller.

33. Defendant Benjamin Churchill is the superintendent of Carlsbad Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Bruce Aster.

34. Defendant David Hansen is the superintendent of Riverside Unified School District, and is the executive officer who implements the deduction of agency fees from the paychecks of Plaintiff Allen Osborn.

35. Defendant Janet Schulze is the superintendent of Pittsburg Unified School District, and is the executive officer who implements the deduction of charitable contributions from the paychecks of Plaintiff George Meilahn.

36. Defendant Xavier Becerra is the Attorney General of California ("the Attorney General"). As "the chief law officer of the State," the Attorney General is charged with "see[ing] that the laws of the State"—including the laws authorizing agency-fee arrangements—"are uniformly and adequately enforced." Cal. Const. art. V, § 13. Because this case challenges the constitutionality of California statutes, the Attorney General would have the right to intervene as a Defendant in this litigation if he were not named as a Defendant. 28 U.S.C. § 2403(b). The Attorney General is sued in his official capacity.

**JURISDICTION AND VENUE**

37. This is an action under the Federal Civil Rights Act of 1871 (42 U.S.C. § 1983) to redress the deprivation, under color of state law, of rights, privileges and immunities secured to Plaintiffs by the Constitution of the United States, particularly the First and Fourteenth Amendments

38. This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Federal Rule of Civil Procedure 57.

39. Venue is proper in this District under 28 U.S.C. § 1391(b).

COMPLAINT

40.     An actual controversy currently exists between the parties concerning the constitutionality of California's agency-shop arrangement.  That arrangement imposes a cognizable injury on Plaintiffs by forcing them or their members to contribute money in support of union activities, and by forcing Plaintiffs to bear a substantial burden in order to opt out of supporting union activities that Defendant Unions themselves classify as political and unrelated to collective bargaining.

41.     This controversy is justiciable in character, and relief is necessary to preserve Plaintiffs' rights and prevent future harm to Plaintiffs.

## FACTUAL ALLEGATIONS

**I.     California's Agency-Shop Law for Public-School Teachers**

42.     Under California law, a union has the option of becoming the exclusive bargaining representative for "public school employees" in a bargaining unit (usually a public school district).  Cal. Gov't Code § 3544(a).  Serving as exclusive representative does not require the union to consider or advocate the policy or employment views of employees who choose not to become members of the union.  Alternatively, if no exclusive representative is certified in a district, a union can elect to represent only those employees that become members of the union.  *Id.* § 3543.1(a).

43.     To become the exclusive representative, the union must submit adequate proof that a majority of employees in the unit wish to be represented exclusively by the union.  *Id.* § 3544(a).  When a union is designated as the exclusive representative, it represents all "public school employees" in that district for purposes of bargaining with the district.  *Id.* § 3543.1(a).  For these purposes, "public school employee" is "a person employed by a public school employer except persons elected by popular vote, persons appointed by the Governor of this state, management employees, and confidential employees [who facilitate employee relations on behalf of management]."  *Id.* § 3540.1(j).

44.     California law defines the "terms and conditions of employment,"

COMPLAINT

concerning which unions may collectively bargain, to include a wide range of issues at the heart of education policy. *Id.* § 3543.2(a)(1). These topics of collective bargaining include wages, hours, "health and welfare benefits," "leave," "transfer and reassignment policies," "safety conditions of employment," "class size," "procedures to be used for the evaluation of employees," and "procedures for processing grievances." *Id.* In addition, a union that has been recognized as the exclusive representative "has the right to consult on," among other things, "the content of courses and curriculum." *Id.* § 3543.2(a)(3).

45.     Under state law, a union that has been recognized as the exclusive bargaining representative for a school district can enter into an agency-shop arrangement (also known as an "organizational security agreement") with that district. State law defines this arrangement as one in which all employees "shall, as a condition of continued employment, be required either to join the recognized employee organization or pay the fair share service fee," which is commonly known as an agency fee. *Id.* § 3546(a). School districts "shall deduct the amount of the fair share service fee authorized by this section from the wages and salary of the employee and pay that amount to the" union. *Id.* The full amount of the agency fee is determined by the union and "shall not exceed the dues that are payable by [union] members." *Id.* In practice, the amount of agency fees is typically equivalent to the amount of union dues.

46.     Unions must divide the agency fee into chargeable and nonchargeable portions. Under state law, the chargeable portion purports to support union activities that are "germane to [the union's] functions as the exclusive bargaining representative." *Id.* California law includes a range of activities in this category, including—"but [] not necessarily [] limited to"—"the cost of lobbying activities designed to foster collective bargaining negotiations and contract administration, or to secure for the represented employees advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and

negotiating with the employer." *Id.* § 3546(b).

47.    The nonchargeable portion of agency fees supports activities that are "not devoted to … negotiations, contract administration, and other activities of the employee organization that are germane to its function as the exclusive bargaining representative." *Id.* § 3546(a). The union is responsible for annually determining which expenses fall into this nonchargeable category.  Unions make this determination by calculating the total agency fee based on expenditures for the coming year, then calculating the nonchargeable portion of this fee based on a recent year's expenditures.  REGS. OF CAL. PUB. EMP'T RELATIONS BD. § 32992(b)(1).

48.    If a teacher chooses to be a member of the union that is the exclusive representative in his or her district, the school district collects the full amount of union dues from that teacher and forwards them to the union.  *Id.* § 3543.1(d); *see also* Cal. Educ. Code §§ 45060, 45061, 45061.5, 45168.

49.    Nonunion teachers, by contrast, are required to pay the above-described agency fees to the union.  Each year, the union must send out a "*Hudson* notice" that sets forth the amount of the agency fee as well as a breakdown of the chargeable and nonchargeable portions of this fee.  Cal. Gov't Code § 3546(a); REGS. OF CAL. PUB. EMP'T RELATIONS BD. § 32992(a); *see generally Chi. Teachers Union, Local No. 1 v. Hudson*, 475 U.S. 292 (1986).  The amount of the total agency fee is determined by the union based on an estimate of its expenditures in the coming year.  The chargeable and nonchargeable portions of the fee are calculated by the union based on an audited financial report for a recent year of the union's expenditures.

50.    The *Hudson* notice must include either the union's audited financial report for the year or a certification from its independent auditor confirming that the chargeable and nonchargeable expenses have been accurately stated.  REGS. OF CAL. PUB. EMP'T RELATIONS BD. § 32992(b)(1).  The independent auditor does not,

however, confirm that the union has properly classified its expenditures.

51.    To avoid paying for nonchargeable expenditures, a nonmember is required to opt out each year by notifying the union of his or her objection. REGS. OF CAL. PUB. EMP'T RELATIONS BD. § 32993.  The period for lodging this objection must last at least thirty days (*id.* § 32993(b)), and typically lasts no longer than six weeks.  Nonmembers who opt out are entitled to a rebate or fee reduction for that year. Cal. Gov't Code § 3546(a).  Absent such an affirmative opt-out by the deadline, the nonmember must pay the full amount of the agency fee.

52.    An agency-fee payer who disagrees with the union's determination of the chargeable portion of the agency fee may file a challenge with the union after receiving the *Hudson* notice.  Upon receipt of an agency-fee challenge, the union must "request a prompt hearing regarding the agency fee before an impartial decisionmaker" selected by either the American Arbitration Association or the California State Mediation Service. *Id.* § 32994(b)(1), (2).

53.    California law provides a limited exception to the agency-fee requirement for "religious objectors"—that is, "any employee who is a member of a religious body whose traditional tenets or teachings include objections to joining or financially supporting employee organizations." Cal. Gov't Code § 3546.3. Collective-bargaining agreements cannot require religious objectors to join a union or pay agency fees to a union.  The agreements can, however—and typically do— require religious objectors to pay the equivalent of the full agency fee (including the non-chargeable portion) to a "nonreligious, nonlabor organization, charitable fund." *Id.*  The agreement must designate at least three approved charities, which are selected by the union serving as the exclusive representative in that district.  The objecting employee then selects which charity will receive his or her payment.

## II.    The Agency-Shop Arrangements in California's Public School Districts

54.    Under color of state law (Cal. Gov't Code § 3540 *et seq*.), Defendant Local Unions have been designated the exclusive bargaining agents for the school

districts in which Plaintiffs are employed as teachers.

55.     Under color of state law (*id.*), Defendant Local Unions have entered into agency-shop agreements with the school districts where Plaintiffs or their members are employed as teachers.  These agreements include provisions requiring all teachers in these districts to either join the unions or pay agency fees to the unions.  The agreements also provide that teachers must contribute to nonchargeable union expenditures unless they go through an opt-out process.

56.     For each school district in which Plaintiffs are employed, the relevant Defendant Local Union determines the total agency fee, often in collaboration with CTA.  After the Defendant Local Union or CTA informs the district of the year's agency-fee amount, the district automatically deducts that amount in pro rata shares from teachers' paychecks (or deducts the chargeable portion of the fee for teachers who opted out of nonchargeable fees), unless the teacher informs the district that he or she will pay the union directly.  The district sends the deducted amounts directly to the Defendant Local Union or CTA.

57.     For each school district in which Plaintiffs are employed, the Defendant Local Union's agency fee includes "affiliate fees" for both CTA and NEA.  Affiliate fees are treated as partially chargeable, with the chargeable portion based on the chargeable portion of all statewide expenditures by CTA and NEA.  Thus, the portions of CTA and NEA affiliate fees deemed chargeable to teachers are not designed to—and do not—correspond to actual collective-bargaining expenditures made by CTA and NEA within each Plaintiff's district.

58.     On information and belief, the bulk of dues do not go to the local union that actually engages in collective-bargaining for a particular district.  Instead, approximately 65% of dues typically is allocated to CTA and 18% is allocated to NEA, leaving only 17% for the local union.

59.     On information and belief, NEA has approximately 100,000 agency-fee payers nationwide, and approximately 28,000 agency-fee payers in California.

COMPLAINT

60.     For each school district in which plaintiffs are employed, the chargeable and nonchargeable portions of the agency fees are calculated based on an audit of the union expenditures in a recent year.  The auditors confirm that the union expenditures were made as indicated, but do not confirm that the union has properly classified the expenditures as chargeable or nonchargeable.

61.     For each school district in which plaintiffs are employed, teachers who are not union members receive a *Hudson* notice each fall, providing a breakdown of the chargeable and nonchargeable portions of the agency fee.  Upon receiving this notice, nonmembers have the option of undergoing the opt-out process, which requires them to object to the nonchargeable portion of the agency fee within approximately six weeks.  If a teacher succeeds in making a timely objection, the union either refrains from collecting the nonchargeable portion of the agency fee or sends a "rebate" check to the teacher equal to the nonchargeable portion of the annual agency fee.  Teachers who receive the *Hudson* notice also have the option of filing a legal challenge to the union's calculation of the chargeable and nonchargeable portions of the agency fee.

62.     Annual dues (or agency fees for nonmembers) typically consume roughly two percent of a new teacher's salary, and sometimes increase regardless of whether there is an increase in teacher pay.  The total amount of annual dues generally exceeds $1,000 per teacher, while the amount of the refund received by nonmembers who successfully opt out of the nonchargeable portion of the agency fee is generally around $350 to $400 annually.

63.     Defendant Unions require nonmembers to "opt out" of subsidizing nonchargeable expenses every year, in writing, during a roughly six-week period following the annual *Hudson* notice.  No matter how many consecutive years a nonmember opts out, that nonmember still must send an opt-out letter to CTA each year.  If a teacher misses the deadline, he or she is obligated to pay the full agency fee for that year.

COMPLAINT

64.     Defendant Unions provide public-school teachers with a membership enrollment form that teachers may wrongly interpret as saying that they can join the union without subsidizing its political activities.  The form states that CTA maintains a political action committee ("PAC"), for which it solicits member donations.  The form then invites CTA members to check a box "if you choose not to allocate a portion of your dues to the [CTA's PAC] account and want all of your dues to remain in the General Fund."  CTA/NEA Membership Enrollment Form (attached as Exhibit I).  This box-checking option potentially creates the mistaken impression that checking the box means a teacher has opted out of subsidizing political expenditures altogether.

65.     In order to participate in the opt-out process, a teacher cannot be a member of the union.  This means that teachers who opt out must forgo the ability to obtain direct benefits through the union, some of which are typically (and would likely otherwise be) obtainable through one's employer.  For example, many unions decline to bargain for disability insurance as part of the employment package that districts offer teachers; the unions instead offer this valuable benefit solely to members as an inducement to join the union.  *See, e.g.*, CTA, *CTA Voluntary Group Disability Insurance*, https://goo.gl/iwV2Ss ("Not all school districts provide Disability Insurance to their employees …."); CTA, *Disability and Life Insurance: CTA Member Benefits For Educators, 2016–2017 School Year* at 15, https://goo.gl/w9l6Y9 (noting that only "member[s] in good standing of CTA" are eligible for disability insurance).  Disability insurance is necessary to, among other things, provide teachers on maternity leave with monies approximating their regular salary.  Most districts provide teachers on maternity leave only with differential pay—that is, "the amount remaining of your salary after the district pays a substitute to fill your position" (CTA, *Pregnancy and Parental Leave Rights*, https://goo.gl/C2mgVR)—such that a teacher would need disability insurance in order to make up the difference.  CTA, *How is CTA saving you money?*,

https://goo.gl/H9pKgj.  Defendant Unions invoke teachers' inability to obtain disability insurance through their school district employers as a reason for encouraging employees to join the union.

66.     Defendant Unions are not required to advocate nonmembers' preferred positions on any issues, either in collective bargaining or outside of bargaining. Moreover, Defendant Unions' approach to collective bargaining would not be any different even if they were not required to bargain on behalf of all employees in the bargaining unit, including Plaintiffs and other nonmembers.

67.     Under the collective bargaining agreements they have secured in each district, Defendant Unions are authorized to represent all employees, including nonmembers, in grievance proceedings.  No Defendant Union is obligated to pursue a grievance if it concludes that the grievance is not in the interest of the entire bargaining unit.  Employees are limited in the degree to which they can pursue grievances on their own behalf; if the union elects not to pursue a grievance past a certain stage, the employee cannot himself or herself pursue the grievance any further.  Defendant Unions' obligation to process grievances is limited to employees who allege some violation of the collective-bargaining agreement.  Ex. A at Art. V, § 1.1; Ex. B at § 8.1.1; Ex. C at § 10.1.1; Ex. D at § 2.01.1; Ex. E at § 20.1; Ex. F at Art. XX, § 1; Ex. G at § 4.2.1.  For teachers who oppose terms of their district's collective-bargaining agreement, assistance in enforcing those terms has little value.  Defendant Unions do not assist nonmembers on matters that would tangibly benefit them, such as resisting discipline or termination.

**III.     Defendant Unions Routinely Take Positions on Political Issues and Matters of Public Concern, Including in Collective Bargaining.**

68.     In recent years, NEA has deemed approximately 48% of its expenditures to be chargeable.  NEA, Consolidated Financial Statements, August 31, 2015 at 33 (attached as Exhibit J).  CTA has deemed approximately 70% of its expenditures to be chargeable.  CTA, *Combined Financial Statements for the Year*

*Ended August 31, 2015*, at 4 (attached as Exhibit K).  Local unions often use the same chargeability percentage as CTA.  This practice is based on a "local union presumption," which presumes that local unions tend to spend as much or more of their budgets on collective bargaining as do their state affiliates.

69.     Dues and agency fees yield significant revenues for the unions.  For example, CTA's revenue in 2015 was $181 million, over $178 million of which (98.6%) came from membership dues and fees.  Ex. K-903.

70.     California's teachers' unions routinely engage in express political advocacy.  For instance, CTA and its affiliated entities (the CTA Association for Better Citizenship, the CTA Issues PAC, and NEA) spent over $211 million in political expenditures (including contributions to candidates and other committees, independent expenditures, and lobbying) from 2000 through 2009.  *See* Cal. Fair Political Practices Comm'n, *Big Money Talks* at 11 (Mar. 2010), https://goo.gl/kLpHTA.  The largest single expenditure, of over $26 million, was made to successfully oppose Proposition 38 on the 2000 ballot, which would have enacted a school-voucher system in California and thereby increased the potential employment pool for teachers.  *Id.*  CTA and its affiliated entities also spent over $50 million opposing three ballot initiatives in 2005:  Proposition 74, which sought to make changes in the probationary period for California school teachers; Proposition 75, which sought to prohibit the use of public employee agency fees for political contributions without individual employees' prior consent; and Proposition 76, concerning state spending and minimum school-funding requirements.  *Id.* at 12.

71.     CTA also takes public positions on a wide range of issues both related and unrelated to the educational system.  For example, CTA opposes school vouchers (CTA, *Issues & Action:  Vouchers,* https://goo.gl/B5AlmL), advocates tax reform that "restore[s] fairness to the system" by increasing taxes on higher earners (CTA, *Issues & Action:  Tax Fairness*, https://goo.gl/Xip9me), and supports

1  immigration reform that provides "timely legalization without regard to national

2  origin" (CTA, *Issues &  Action:  Immigration Reform*, https://goo.gl/nsdKAw).

3      72.    CTA is a major donor to the California Democratic Party.  From 2003

4  to 2012, CTA and its affiliated entities (including the CTA Association for Better

5  Citizenship) spent nearly $102 million on political contributions, with only 0.08%

6  of that money going to Republicans.  Troy Senik, *The Worst Union in America*,

7  City Journal (Spring 2012), https://goo.gl/qN44Cy.  CTA also spends money on

8  direct political advocacy, much of which is spent on issues with no connection to

9  education.  For example, CTA and its affiliated entities (including CTA Issues

10 PAC) spent over $1 million—more than any other entity—on the opposition to

11 Proposition 8, the state ballot initiative seeking to ban same-sex marriage.  *Id.*;

12 Evelyn Larrubia, *$1 million from teachers' union to oppose Prop. 8*, L.A. Times

13 (Oct. 17, 2008), https://goo.gl/JXW4i4.

14      73.    CTA also encourages its members to engage in extensive political

15 activism in the public schools where they work.  For example, as part of a 2011

16 campaign to lobby the California legislature on school funding issues, CTA

17 distributed a list of practices that it suggested to its teacher-members as ways to

18 further CTA's campaign in their classrooms.  Dina Martin, *State of Emergency*, 15

19 Cal. Educator 7, https://goo.gl/ZHYcV8; CTA, *L.E.A.R.N.:  State Council Ideas for*

20 *Potential Activities*, https://goo.gl/XcK09U ("*L.E.A.R.N.*").  Among other things,

21 CTA suggested that teachers:

22      • "Take ½ photo of Assembly members and have kids draw the other half

23        with a message stating what they want for their teachers" (*L.E.A.R.N.* at

24        1);

25      • To visualize "how 3 classrooms are shuffled into two," have "kids sit on

26        floor with no books, chanting, 'we need a teacher'" (*id.* at 5);

27      • Organize a "Student Video Contest" in which teachers would conduct a

28        "contest for youth to create a video about what education costs would

1  mean to them" (*id.* at 10).

2      74.    NEA likewise engages in widespread political advocacy on a wide

3  range of issues.  This includes support for firearm restrictions (*Sensible Solutions*

4  *for Safer Schools* at 26, VIVA NEA Idea Exchange (Apr. 24, 2013),

5  https://goo.gl/74D5Oc), and support for the Affordable Care Act (NEA, *Affordable*

6  *Health Care for America*, https://goo.gl/ohS6wS).  NEA has endorsed every

7  Democratic presidential nominee since 1976, and has never endorsed a Republican

8  presidential nominee.  Lauren Camera, *Teachers Union Backs Clinton for*

9  *President*, U.S. News (Oct. 3, 2015), https://goo.gl/48lUKt; *NEA Endorses Kerry*

10  *for President*, USA Today (July 6, 2004), https://goo.gl/Myqwfp.  Of the 295

11  candidates that NEA endorsed in United States House and Senate races in 2016,

12  272 (92%) were Democrats.  NEA Fund, *Recommended Candidates*,

13  https://goo.gl/jtSKwY.

14      75.    When Defendant Unions advocate concerning employment terms and

15  conditions in the context of lobbying or other political activities, they do not seek

16  preferential conditions for union members.

17      76.    Defendant Unions engage in advocacy on many of the same topics in

18  the contexts of both lobbying and collective bargaining.  For instance, they have

19  lobbied to secure a number of state statutes addressing topics that would otherwise

20  be topics of collective-bargaining, including tenure, seniority preferences in layoffs,

21  and termination procedures.  *See, e.g.*, Cal. Educ. Code §§ 44929.21(b); 44934;

22  44938(b)(1), (2); 44944; 44955.

23      77.    In coordination with their express political advocacy, California's

24  teachers' unions routinely take positions in the collective-bargaining process that

25  have profound political and budgeting consequences.  For example, public-sector

26  unions' collective bargaining over wages and benefits has a significant impact on

27  public finances.  In 2015, the total cost of wages and benefits for state and local

28  workers nationwide was $1.4 trillion—more than half of the $2.6 trillion in total

spending by state and local governments.  U.S. Bureau of Econ. Analysis, *National Income and Product Accounts* (https://goo.gl/nBKNRG), Table 3.3 ("State and Local Government Current Receipts and Expenditures") and Table 6.2D ("Compensation of Employees by Industry").  And beyond wages and benefits, Defendant Unions bargain over many other issues of educational policy, many of which are the subjects of robust debate.  For instance, Defendant Unions collectively bargain for seniority preferences in transferring and reassigning teachers.  Ex. A at Art. VII, §§ 3.1, 6.1; Ex. B at §§ 11.3.5, 11.4.1, 11.5.7; Ex. C at §§ 13.2.6, 13.3.4, 13.5.3, 13.6.4; Ex. D at § 4.03.1; Ex. E at § 17.2; Ex. F at Art. XV, §§ 2(A), § 3(C); Ex. G at § 9.3.1.

78.     In addition, Respondent Unions advocate policies that affirmatively harm teachers who are above average relative to their colleagues.  For instance, NEA's "basic contract standards" include, among other things:  "[l]ayoff and recall based only on seniority as bargaining unit members, licensure/certification, and … affirmative action"; and "[s]alary schedules … that exclude any form of merit pay except in institutions of higher education where it has been bargained."  NEA, *2016 Handbook* at 289-90, https://goo.gl/2vPMRH.  NEA also considers any "system of compensation based on an evaluation of an education employee's performance" to be "inappropriate," and "opposes providing additional compensation to attract and/or retain education employees in hard-to-recruit positions."  *Id.* at 291.

79.     CTA classifies expenditures as being chargeable—and thus germane to collective bargaining—even when those expenditures appear to have little to do with collective bargaining.  For example, in 2014-2015, CTA made the following chargeability classifications:

- A program on "Human Rights, Women, and GLBT Issues":  100% chargeable.  Ex. K-921.
- "Cyber Café":  100% chargeable.  Ex. K-924.
- Publication and dissemination of CTA's internal magazine, *The*

*California Educator*:  80.8% chargeable.  Ex. K-920.

80.    Further, while the documents that CTA gives to teachers do not provide much detail on the activities underlying the listed charges, those documents do further reflect that CTA deems "Regional Services" to be 91.7% chargeable (Ex. K-917), despite "Regional Services" appearing to contain expenditures on numerous activities unrelated to bargaining.  *See* Ex. K-929-930 (listing targets of "emphasis" in 2014-2015, including "[o]rganizing and training for political action activities at the state, local, and national levels"; "[s]upporting local and regional organizing activities to influence the re-authorization of the Elementary and Secondary Education Act"; and "[i]ncreasing CTA members in newly established charter schools").

81.    CTA maintains that "[c]hargeable expenses generally include … those related to" policy strategizing or public polling.  *See* Ex. K-938 ("[s]trategic planning and polling on priorities for association activities").

82.    NEA likewise classifies expenditures as chargeable even when those expenditures appear to have little to do with collective bargaining.  For example, in 2014-2015, NEA made the following chargeability classifications:

- "Advance NEA's student-centered social and economic justice agenda in public schools": 83.4% chargeable.  Ex. J-883.
- "Create locally-based or state-based 'campaigns' … to improve teaching and learning conditions": 99.3% chargeable.  Ex. J-881.
- "[A]dvance NEA's criteria for Great Public Schools and workforce quality agenda": 77.6% chargeable.  Ex. J-882.
- "[D]evelop [affiliates'] capacity and enhance their effectiveness" in membership and organizing: 81.8% chargeable.  Ex. J-882.

83.    NEA also deems to be partially chargeable spending such as "using popular culture and the arts as a tool to … effectively support mission-critical communications" (43.2% chargeable) (Ex. J-885); "[p]rovid[ing] technical

COMPLAINT

assistance and support to NEA Leaders to advance policy and practice that supports NEA's mission, vision, and core values (17.4% chargeable) (Ex. J-884); and "supporting affiliates to activate our vast network in pursuit of the Association's vision" (63.9% chargeable) (NEA Letter, Chargeable & Nonchargeable Audited Expenditures by Core Function Area and Strategic Goal Category at 4 (Aug. 8, 2016) (attached as Exhibit L)).

84.    NEA has "determined that *chargeable* activities and expenditures were related to" actions focused on setting employment terms in public schools that affect core education policy, including, for example, "promotions," "discharge," and "performance evaluation." Ex. J-889.

85.    California law deems as chargeable "the cost of lobbying activities designed to foster collective bargaining negotiations and contract administration, or to secure for the represented employees advantages in wages, hours, and other conditions of employment in addition to those secured through meeting and negotiating with the employer." Cal. Gov't Code § 3546(b).

**IV.    California's Agency-Shop Law and Allowance of Opt-Out Requirements Both Violate the First Amendment.**

86.    California's agency-shop arrangement violates the First Amendment rights of Plaintiffs and other public-school teachers who are not union members. There is no justification—much less a compelling one—for mandating that Plaintiffs make contributions to support collective bargaining and the other activities of California's teachers' unions, which are among the most powerful and politically controversial organizations in the State. Particularly given the inherently political nature of collective bargaining and its profound economic consequences, the First Amendment forbids coercing any money from Plaintiffs to fund so-called chargeable union expenditures. In any event, forced subsidization of speech concerning even mundane commercial, apolitical topics is unconstitutional. Moreover, even if the First Amendment did somehow tolerate conditioning public

1   employment on subsidizing unions, there is still no justification for forcing

2   Plaintiffs and other teachers to pay for political and ideological activities—

3   expenditures that the unions themselves admit are nonchargeable under the First

4   Amendment—unless they affirmatively opt out of making payments each year.

5         A.    *Conditioning Public Employment on the Payment of Mandatory*

6               *Fees to Support Collective Bargaining Is Unconstitutional.*

7         87.    Agency-shop arrangements impose a "significant impingement on

8   First Amendment rights" because "[t]he dissenting employee is forced to support

9   financially an organization with whose principles and demands he may disagree."

10   *Ellis v. Bhd. of Ry., Airline & S.S. Clerks*, 466 U.S. 435, 455 (1984)).  This

11   "impingement" is quite severe because "public-sector union[s] take[] many

12   positions during collective bargaining that have powerful political and civic

13   consequences." *Knox*, 132 S. Ct. at 2289.

14         88.    As the Supreme Court has explained, "compulsory subsidies for

15   private speech are subject to exacting First Amendment scrutiny and cannot be

16   sustained unless two criteria are met.  First, there must be a comprehensive

17   regulatory scheme involving a 'mandated association' among those who are

18   required to pay the subsidy." *Knox*, 132 S. Ct. at 2289 (citing *United States v.*

19   *United Foods, Inc.*, 533 U.S. 405, 414 (2001)).  "Such situations are exceedingly

20   rare because … mandatory associations are permissible only when they serve a

21   compelling state interest … that cannot be achieved through means significantly

22   less restrictive of associational freedoms." *Id.* (citation omitted).  "Second, even in

23   the rare case where a mandatory association can be justified, compulsory fees can

24   be levied only insofar as they are a 'necessary incident' of the 'larger regulatory

25   purpose which justified the required association.'" *Id.* (quoting *United Foods*, 533

26   U.S. at 414).

27         89.    California's agency-shop arrangement does not serve any compelling

28   state interest, nor is it narrowly tailored to serve whatever interest the State may

COMPLAINT

have.  There is no compelling or even persuasive evidence that compulsory agency fees are needed to achieve "labor peace" in California or its public schools, or to prevent "free riding" on unions' collective-bargaining.  Nor is there any compelling or even persuasive evidence that such a compulsory policy is the least restrictive means of securing equitable policies in public employment.  Moreover, compulsory agency fees are not a necessary incident of any larger regulatory purpose.  Finally, any governmental interest in "labor peace" or preventing "free riding" does not out-weigh Plaintiff's interest in not subsidizing the Unions' speech, or otherwise justify such coerced subsidization.

> **B.**  *The Opt-Out Requirement for Nonchargeable Expenditures Is Unconstitutional.*

90.    Under the State's agency-shop provisions, any public-school teacher who wishes to withhold contributions to unions' nonchargeable expenditures must provide written notification that they are opting out each year.  CTA must receive this written notification by a hard deadline or the request to opt out will be denied and the teacher will be required to pay full dues for the subsequent year.  No matter how many years in a row a nonmember has opted out of paying the political portion of agency fees, that nonmember must still send written notification each year to CTA in order to successfully opt out.

91.    This requirement to pay for political and ideological activities absent annual, affirmative disapproval constitutes a serious burden on the First Amendment rights of public employees.  It also creates an environment susceptible to contrary pressure by union personnel.  Finally, given the strong likelihood that individuals who choose not to join the union prefer not to subsidize the union's explicitly political expenditures by paying full agency fees, nonmembers should be presumed to be noncontributors unless they affirmatively opt in.  In short, the Constitution requires unions seeking political donations to solicit those donations from nonmembers through the ordinary process of voluntary, affirmative consent.

92.     In *Abood v. Detroit Board of Education,* 431 U.S. 209 (1977), the

Supreme Court upheld the constitutionality of compelling payment of agency fees

by public employees.  And in *Mitchell v. Los Angeles Unified School District*, 963

F.2d 258 (9th Cir. 1992), the Ninth Circuit upheld a requirement that nonmembers

opt out of paying the nonchargeable share of dues.  Consequently, stare decisis may

restrict the ability of lower federal courts to grant Plaintiffs the relief they seek.

93.     The Supreme Court granted certiorari to consider the constitutionality

of agency-fee arrangements and opt-out requirements in *Friedrichs v. California*

*Teachers Association* (No. 14-915).  On March 29, 2016, however, an equally

divided Court affirmed the Ninth Circuit's judgment denying challenges to both

practices in light of the binding precedents in *Abood* and *Mitchell*.  *Friedrichs v.*

*Cal. Teachers Ass'n*, 136 S. Ct. 1083, *reh'g denied,* 136 S. Ct. 2545 (2016).

**FIRST COUNT:**

**Exacting Compulsory Fees to Support Collective Bargaining**

**Violates the First Amendment.**

94.     Plaintiffs incorporate and reallege each and every allegation contained

in the foregoing paragraphs of this Complaint, as though fully set forth herein.

95.     The First Amendment to the United States Constitution provides:

"Congress shall make no law … abridging the freedom of speech."

96.     The Fourteenth Amendment to the United States Constitution

incorporates the protection of the First Amendment against the States, providing:

"No State shall make or enforce any law which shall abridge the privileges or

immunities of citizens of the United States; nor shall any State deprive any person

of life, liberty, or property, without due process of law; nor deny to any person

within its jurisdiction the equal protection of the laws."

97.     By requiring Plaintiffs to make any financial contributions in support

of any union, California's agency-shop arrangement violates Plaintiffs' rights to

free speech and association under the First and Fourteenth Amendments to the

1   United States Constitution.

2        98.   Plaintiffs have no adequate remedy at law.

3   **SECOND COUNT:**

4   **Requiring Opt-Out for Nonchargeable Expenses**

5   **Violates the First Amendment.**

6        99.   Plaintiffs incorporate and reallege each and every allegation contained

7   in the foregoing paragraphs of this Complaint, as though fully set forth herein.

8        100.  By requiring Plaintiffs to undergo opt-out procedures to avoid making

9   financial contributions in support of nonchargeable union expenditures, California's

10  agency-shop arrangement violates Plaintiffs' rights to free speech and association

11  under the First and Fourteenth Amendments to the United States Constitution.

12       101.  Plaintiffs have no adequate remedy at law.

13  **COSTS AND ATTORNEYS' FEES**

14       102.  Pursuant to 42 U.S.C. § 1988, Plaintiffs further seek an award of their

15  costs, including reasonable attorneys' fees, incurred in the litigation of this case.

16  **PRAYER FOR RELIEF**

17       An actual controversy has arisen between the parties entitling Plaintiffs to

18  declaratory and injunctive relief.

19       WHEREFORE, Plaintiffs pray that this Court:

20       (A)   Enter a judgment declaring that California's agency-shop law, codified

21  in California Government Code § 3540 *et seq*., impermissibly abridges Plaintiffs'

22  First Amendment free speech rights by requiring payment of any fees to any union

23  as a condition of public employment;

24       (B)   Enter a judgment declaring that California's agency-shop arrangement,

25  codified in California Government Code § 3540 *et seq*., impermissibly abridges

26  Plaintiffs' First Amendment free speech rights by requiring payments in support of

27  nonchargeable union expenditures unless they affirmatively opt out of such

28  payments;

     COMPLAINT

1      (C)    Enter an injunction barring Defendants from seeking to require

2   nonunion employees to pay any monies that support any union or, at a minimum,

3   barring Defendants from seeking to require payments for nonchargeable

4   expenditures from any employee who has not affirmatively stated a willingness to

5   financially support such expenditures;

6      (D)    Grant Plaintiffs such additional or different relief as it deems just and

7   proper, including an award of reasonable attorneys' fees and the costs of this action.

8

9   Dated:       February 6, 2017       JONES DAY

10

11                                By: /s/ John A. Vogt

12                                    John A. Vogt

13                                Attorney for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                    COMPLAINT